Forest Hills School District, Appellant *v.* Forest Hills Education Association, Appellee. (2 Cases)

Argued May 9, 1979, before President Judge Bowman and Judges Crumlish, Jr., Mencer, Blatt, DiSalle, Craig and MacPhail. Judges Wilkinson, Jr. and Rogers did not participate.

*Gilbert E. Caroff,* for appellant.

*William K. Eckel,* for appellee.

OPINION BY JUDGE CRAIG, September 13, 1979:

These are appeals by the Forest Hills School District from orders of the Court of Common Pleas of Cambria County sustaining two separate awards of arbitrators, each of which sustained a labor grievance filed by the Forest Hills Education Association.

When the previous collective bargaining agreement between the school district and the association expired on June 30, 1974, the parties were negotiating a new one. Because the parties did not reach a new agreement by the date set for the opening of the 1974-75 school year, the members of the association struck and classes did not open as scheduled.

The district meanwhile had adopted a 1974-75 school calendar in August (the August calendar) establishing September 3, 1974 as opening day and also providing for 180 teaching days and four in-service days, designated as February 17, 18, 19 and June 9, 1975.

The parties reached agreement on a new contract and ratified it on September 18, 1974. The next day, the teachers returned to work and school started.

The new agreement expressly covered the period from July 1, 1974 to June 30, 1976 and in Article VII provided that the annual salary was that set forth in Appendix A, which, in relevant part, reads:

The Salary Guide for 1974-75 school year shall be for a contract year of 184 days. . . . In-Service days shall be included in these contract years. Unexcused absence from any school-day or in-service day shall result in the loss of one day (1/184) of the annual basic salary during the 1974-75 school year. . . .

Article IX of the agreement provided that Appendix C accurately reflected hours and conditions of employment. Appendix C reads in part:

LENGTH OF SCHOOL TERM

The contracted length of the school term shall be a maximum of 180 teaching days, plus four (4) in-service days (184 days total) during the 1974-75 school term. . . .

Article XII of the agreement provided that all negotiable items were included in the discussions giving rise to the agreement, and that the agreement was the final embodiment of those negotiations.

The two grievances involved in these appeals arose when, on January 8, 1975, the school district unilaterally adopted a revised calendar (the January calendar) covering the 1974-75 school year, which provided for only 175 teaching days and a single in-service day, consistent with the actual opening of school on September 19.

In March of 1975, the school district paid the teachers a portion of their salary which reflected a loss of five regular teaching days by subtracting 1/184 of the annual base salary for each of five days it attributed to "unexcused absences" for some of the days lost while the teachers had been on strike. The Association grieved this action, alleging that the school district had violated the new collective bargaining agreement by failing to schedule and pay for a total of 180 instructional days, the negotiated salary base for the

1974-75 school year. Arbitrator Stonehouse agreed on the pay grievance.

In a separate action at the same time, the school district also deducted pro-rata from the base salary a loss of the four in-service days called for in the agreement. The association also grieved this deduction, and eventually Arbitrator McDaniel upheld that grievance.

Here the school district contends: (1) that it exercised its managerial prerogative when it adopted the January 8 calendar, and the salaries were properly reduced in accordance with that calendar because the revision of the calendar was proper in that the collective bargaining agreement did no more than set a maximum number of working days; (2) that the Stonehouse and McDaniel arbitration awards obligate the school district to pay teachers for the period they were on strike in contravention of the statutory prohibition against such pay found in Section 1006 of The Public Employe Relations Act (PERA) ;[1] and (3) that in any event, both awards "were decided contrary to the facts of the case," a contention we understand to mean that the awards did not draw their "essence" from the collective bargaining agreement they purported to interpret.[2]

---

[1] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §1101.1006, which reads:

> No public employe shall be entitled to pay or compensation from the public employer for the period engaged in any strike.

[2] Because of the limited judicial review of arbitration awards mandated by Section 11(d) of the Act of April 25, 1927, P.L. 381, *as amended*, 5 P.S. §171(d), a court will uphold an award in which an arbitrator has had to determine the intention of the disputing parties, as evidenced by their bargained agreement, if the arbitrator's interpretation " 'can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention. . . .' " *Community College*

In this agreement, there is no doubt that there are ambiguities which required resolution by arbitration. To be upheld, the arbitrators' resolution of these ambiguities need only to be, in some rational way, derived from the language of the agreement and other surrounding indicia of the parties' intent. *Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA)*, 473 Pa. 576, 375 A.2d 1267 (1977).

This case is factually similar to *Carmichaels Area School District v. Carmichaels Area Education Association*, 37 Pa. Commonwealth Ct. 141, 389 A.2d 1203 (1978).

In that case, the arbitrator's award also sustained a grievance, rejecting the school district's argument that the salaries fixed in the agreement could be subjected to a pro-rated reduction on a per diem basis for days lost because of a strike. The award held that, reading together the provisions in that agreement, which set a maximum number of working days and stated that the agreement represented the entire understanding of the parties, the school district obligated itself, from the effective date of the agreement, to pay specified salaries for a school year having a length equal to the number of days set out in the agreement. We affirmed the lower court's approval of that award.

The only factual differences between this case and the *Carmichaels* case are: (1) that Appendix A in the agreement involved here specifically provides for per diem pro-rata reductions in the annual salary for ''un-

---

*of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA)*, 473 Pa. 576, 594, 375 A.2d 1267, 1275 (1977), quoting *Ludwig Honald Mfg. Co. v. Fletcher*, 405 F.2d 1123 (3d Cir., 1969); *reiterated in Lewisburg Area Education Association v. Board of School Directors, Lewisburg Area School District*, 474 Pa. 102, 376 A.2d 995 (1977).

excused absences,'' and (2) that the effective date of the *Carmichaels* agreement ran from the day the strike ended, but the effective date of the agreement here was made retroactive to July 1, 1974, a date preceding the strike and the adoption of the August calendar.

However, as in the *Carmichaels* case, the respective arbitrators here found that the collective bargaining agreement provided for a maximum number of days as the ''contracted length of the school term'' and contained a salary guide based upon such a maximum term.

Arbitrator McDaniel found that:

[T]he Parties' Agreement had specified 'annual basic salary amounts' to be paid bargaining unit employees—with deductions therefrom, only, for 'unexcused absences' on scheduled work days. Under its terms, such annual basic salary amounts, otherwise were fully payable— despite whether any negotiated *maximum* number of work days had or had not been *scheduled* by the school district. No other deductions, or bases therefor, appear to have been agreed to or recognized, in any event, by the Parties. (Emphasis in original.)

Arbitrator Stonehouse drew a similar conclusion: At the conclusion of the strike the District signed a contract providing an annual salary of so many dollars for a 'maximum' of 180 instruction days. This would imply . . . that the annual salary could be paid for something less than 180 days. And the only deduction from salary provided in the Agreement was for unexcused absences.

Neither arbitrator found that the parties intended ''unexcused absences'' to include days lost while on strike. Because the agreement here was signed to con-

clude the strike, we believe that interpretation to be sound and rationally based in the agreement's context.

Such an interpretation of the concept of "unexcused absences" leaves no basis for overturning the conclusions of the arbitrators that the school district obligated itself to pay the salaries specified in the Salary Guide of Appendix A for a school term not to exceed 180 teaching days and four in-service days. As we held in *Carmichaels,* this interpretation is one rationally derived from the language and context of the agreement.

The district, however, also strongly argues that the fatal flaw in such an interpretation of the agreement is that it assumes that the association and the school district intended to incorporate the August calendar into the agreement, and therefore bargained away its managerial prerogative to set the school calendar unilaterally in January. Because the agreement's effective date was made retroactive to July 1, 1974, we understand the temptation to draw that conclusion.

However, our review of the record in this case reveals that, although the court below may have based its affirmance of these arbitration awards on the assumption that the parties intended the August calendar to be an integral part of the agreement, neither of the arbitrators considered the incorporation of the August calendar to be essential to reach their respective conclusions. We likewise do not consider it necessary to consider the August calendar as part of the agreement to uphold these arbitration awards.

The language of Appendices A and C, as incorporated by Articles VII and IX of the agreement, are the significant provisions, and the parties agreed to these provisions on September 18, 1974, not on July 1, 1974. The formal effective date of the agreement is thus not as significant here as the date the parties

formally agreed. Arbitrator Stonehouse recognized
this significance:

> Assuming the [School] Board had the unilater-
> al authority to alter the *calendar,* this . . . did
> not give it the authority to alter the Agreement
> unilaterally. In fact, unilateral changes in the
> *Salary Guide* are specifically excluded by Arti-
> cles IX and XII of the Agreement. If, at the
> conclusion of the negotiations, the District had
> come forward forthrightly and demanded a
> change in the Agreement to reduce the work
> year with a correspondent reduction in salaries,
> or had it demanded the word 'maximum' be
> changed to 'minimum' its position would have
> been sound. But it did not do so. (Our empha-
> sis.)

Arbitrator McDaniel reasoned likewise:

> Moreover, while it [the school district] may
> not have been required to schedule . . . 184 work
> days in its 1974-75 school term, that this agreed-
> to 'maximum' number could have been sched-
> uled (after the Parties' Agreement was signed
> on September 18, 1974) goes beyond reason-
> able question. Equally significant, the District
> could have sought to exclude earlier occurring
> 'strike days' therefrom—for annual basic sala-
> ry payment purposes, at least—under the Par-
> ties' Agreement. Yet, as negotiated and exe-
> cuted *after* the more than two (2) weeks of ab-
> sences by affected employees, the Agreement
> had contained no reference to pay 'deductions'
> therefor, in any of its provisions. (Emphasis in
> original.)

It is thus apparent that both arbitrators reached
their respective decisions without contradicting the
asserted managerial prerogative of the school board
to set the school calendar and without assuming that

the parties intended to include the August calendar in the Agreement.

Instead, both arbitration decisions concluded that the school district and the association agreed upon specified salary schedules for the 1974-75 school year on September 18, 1974 for a school term not to exceed 184 days, and although the school district may have retained the managerial prerogative to adopt a school calendar within and below the 184-day ceiling, it could not, under the agreement, use its power to adopt a school calendar to reduce the agreed-upon salaries.

Because the arbitration decisions did not assume incorporation of the August calendar into the agreement, neither award constitutes a mandate requiring payment for days on strike.

The strike pre-dated the signing of the agreement. When the parties reached agreement the strike ended and the agreement provided for specified salaries for the 1974-75 school year and a maximum number of teaching and in-service days. If the loss of school days due to the strike made a shorter calendar necessary or more feasible, such action did not necessarily affect the salaries. What we said in *Carmichaels* is equally applicable to both awards here:

> Neither the grievance nor the arbitrator's eventual award was concerned with pay for the period during which the Association was on strike, a period which predated the agreement, but rather with the District's failure to abide by its contractual obligation to pay specified salaries for the . . . school year which the District was free to schedule as it chose.

*Carmichaels Area School District v. Carmichaels Area Education Association*, 37 Pa. Commonwealth Ct. at 149, 389 A.2d at 1207.

Consequently, we do not find the arbitration awards here to be either lacking a rational basis in

the agreement or illegal. Accordingly, we affirm the respective orders of the court below.

#### ORDER IN 1911 C.D. 1978

AND Now, this 13th day of September, 1979, the decree of the Court of Common Pleas of Cambria County at No. 1978-570 is hereby affirmed.

#### ORDER IN 1912 C.D. 1978

AND Now, this 13th day of September, 1978, the decree of the Court of Common Pleas of Cambria County at No. 1978-958 is hereby affirmed.